**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 18, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

REED WILLIAMS, individually and
as co-assignee of The Golden Bone,
LLC, a dissolved Colorado limited
liability company, and MARCY
ALBIN, individually and as co-
assignee of The Golden Bone, LLC, a
dissolved Colorado limited liability
company,

      Plaintiffs-Appellants,

    v.

RICHARD L. BERNEY, in his
individual capacity, and CITY AND
COUNTY OF DENVER, a government
entity,

      Defendants-Appellees.

No. 06-1177

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 04-cv-186-WYD-MJW)**

---

Ross B.H. Buchanan, Buchanan, Jurdem & Cederberg, P.C., Denver, Colorado,
for Plaintiffs-Appellants.

J. Andrew Nathan, Nathan, Bremer, Dumm & Myers, P.C. (Marni Nathan Kloster,
Nathan, Bremer, Dumm & Myers, P.C., for Appellee Richard Berney, and Thomas
G. Bigler, Assistant City Attorney, City Attorney's Office, for Appellee City and
County of Denver, with him on the brief), Denver, Colorado, for Defendants-
Appellees.

Before **HARTZ**, **McKAY**, and **TYMKOVICH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

While delivering a licensing notice to a kennel business, Denver business license inspector Richard Berney physically assaulted Reed Williams and Marcy Albin, co-owners of the business. Williams and Albin sued Berney and his employer, the City and County of Denver, alleging the assaults violated their procedural and substantive due process rights under 42 U.S.C. § 1983. They also alleged state law battery and extreme and outrageous conduct claims against Berney.

The district court granted partial summary judgment on the substantive due process claim, reasoning that Berney's tortious conduct did not rise to the level of a constitutional violation under § 1983. Plaintiffs appealed. While Berney's conduct was plainly objectionable, we agree with the district court that he did not violate Plaintiffs' constitutional rights.

Accordingly, we AFFIRM the district court's grant of summary judgment on Plaintiffs' substantive due process claim.[1]

---

[1] At the summary judgment stage, Plaintiffs abandoned their procedural due process claim under § 1983. Plaintiffs' state law claims against Berney, however, are stayed pending further order of the district court.

-2-

## I. Background

For the purposes of summary judgment, Berney and the City accepted the relevant allegations in Plaintiffs' complaint and argued Plaintiffs could not, as a matter of law, establish a violation of their substantive due process rights.

According to the complaint, Plaintiffs Williams and Albin co-owned and operated The Golden Bone, a "doggie daycare" business located in Denver, Colorado. When they opened their business, an official with Denver's Department of Excise and License told them a kennel license was unnecessary. But Denver apparently changed its licensing policy several weeks after this conversation, and the Department began requiring all pet daycare businesses to have a kennel license.

Richard Berney worked for the City as a business license inspector charged with monitoring and enforcing compliance with Department rules and regulations. Five days after the change in licensing policy, Berney walked into The Golden Bone in an agitated and aggressive manner, told the owners their business needed to have a license, and threatened to shut it down. Albin then explained they had relied on the Department's representation that the business did not require a license. Berney accused Albin of lying and showed her a copy of the licensing ordinance. Albin asked to make a photocopy and walked away to do so.

Having decided that Albin was taking too long to photocopy the ordinance, Berney followed her into the rear of the business, ignoring signs restricting access

to visitors. Williams, who was present, asked Berney to return to the front lobby area and wait for Albin. Berney refused, "stating repeatedly that he was a City official and could go wherever he wanted to go, all the while using profane and threatening language and forceful movements of his body." Aplt. App. at 21 ¶ 12.

A confrontation ensued during which Berney assaulted both Plaintiffs. According to the complaint, Berney "without provocation . . . pushed, shoved and repeatedly struck . . . Williams . . . both inside and outside the business premises." *Id.* at 21 ¶ 14. When Albin tried to help Williams, Berney also struck and pushed her. *Id.* at 22 ¶ 15. Ten days later, Williams suffered a stroke, which he attributed to the fight.[2]  Both Plaintiffs alleged physical, emotional, and economic injuries.

## II. Analysis

Plaintiffs contend Berney's assault violated the Fourteenth Amendment's protections of substantive due process—the right to be free from conscience-shocking government conduct. They argue Berney's conduct created a fact question for the jury, making summary judgment improper. We disagree.

---

[2] The district court concluded fact questions remained for trial on the question whether the attack proximately caused the stroke. *Williams v. Berney*, No. CIV04CV186WYDMJW, 2006 WL 753208, at *6 (D. Colo. Mar. 20, 2006). Neither Defendant appealed this issue.

## A. Standard of Review

We review the district court's grant of summary judgment de novo using the same standard the district court used. *Croy v. COBE Labs., Inc.*, 345 F.3d 1199, 1201 (10th Cir. 2003). Summary judgment is appropriate only when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). The district court thus resolved summary judgment purely as a matter of law, ruling in favor of Berney on qualified immunity grounds and in favor of the City based on the lack of municipal liability.

"When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, who must first establish that the defendant violated a constitutional right." *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001) (explaining that the first step in analyzing qualified immunity cases asks, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendant's] conduct violated a constitutional right?"). Moreover, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Cortez*, 478 F.3d at 1114 (quoting *Saucier*, 533 U.S. at 201).

Only if the plaintiff can show a constitutional violation do the courts ask whether "the constitutional right was clearly established." *Id.* To overcome the qualified immunity defense, then, the plaintiff carries the burden of showing both that a constitutional violation occurred and that the constitutional right was clearly established at the time of the alleged violation. *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995).

## B.  Substantive Due Process Framework

This case once again "requires us to wade into the murky waters of § 1983-based" substantive due process claims. *Becker v. Kroll*, 494 F.3d 904, 913 (10th Cir. 2007). Substantive due process arises from the Fourteenth Amendment's protections against governmental deprivations "without due process of law." U.S. Const. amend. XIV, § 1. Under this framework, due process protections are accorded primarily "to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272 (1994). And, moreover, in extending these concepts to further bar "certain government actions regardless of the fairness of the procedures used to implement them," the Supreme Court has emphasized "that only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 840, 846 (1998) (quotations omitted). Importantly for purposes of this appeal, these constitutional protections apply to transgressions

-6-

*above and beyond* those covered by the ordinary civil tort system; the two are not coterminous.

### 1. Contours of a Constitutional Tort

What differentiates a constitutional transgression from an ordinary common law tort is a "level of executive abuse of power . . . that . . . shocks the conscience." *Id.* at 846. In other words, the executive abuse represents "arbitrary action of government" and requires a showing of government officials "abusing their power, or employing it as an instrument of oppression." *Id.* at 845–46 (quotations and brackets omitted). While recognizing "no calibrated yard stick," *id.* at 847, the Supreme Court instructs that the "constitutional concept of conscience shocking duplicates no traditional category of common-law fault," *id.* at 848.

The Supreme Court has also explained, "[r]ules of due process are not . . . subject to mechanical application in unfamiliar territory." *Id.* at 850. What

> shocks [the conscience] in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstance before any abuse of power is condemned as conscience shocking.

*Id.* Thus, the cases recognize that common-sense distinctions exist between force in one setting (say, a prison) and force in another (say, a kennel business). The case law also recognizes official conduct may be more egregious in circumstances allowing for deliberation (such as when a person is in custody or under

-7-

governmental control or supervision) than in circumstances calling for quick decisions (such as police chases or prison disturbances). *See id.*

These distinctions in the application of force are not always facilely drawn. Given the latitude we ordinarily afford government actors operating in their official capacities, we recognize constitutional torts only "in the narrowest of circumstances," *Becker*, 494 F.3d at 922. The tortious conduct alleged "must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing *government* power. . . . [It] must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Livsey v. Salt Lake County*, 275 F.3d 952, 957–58 (10th Cir. 2001) (emphasis added) (quotation omitted). "Not surprisingly, little governmental action is held unconstitutional under th[is] formulation[]." 1 Martin A. Schwartz, *Section 1983 Litigation* § 3.05[D], at 3-116 (4th ed. 2006).[3]

Even with these general principles in mind, Plaintiffs' case presents a narrow issue that has generated a surprising dearth of reported authority: whether

---

[3] The Supreme Court recognizes, moreover, "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). And the Court has repeatedly acknowledged that substantive due process law is not "a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Paul v. Davis*, 424 U.S. 693, 701 (1976).

a § 1983 plaintiff can successfully assert a substantive due process right to be free from intentional use of force by a state actor *not authorized* to use force.

### 2.  Analogous Torts:  Police, Prison, and School Discipline Cases

Plaintiffs argue we should resolve their substantive due process claim through the familiar prism of constitutional cases dealing with police encounters, prison confinement, and school discipline.

They point, for example, to the legal standard established in police excessive force cases, where we look to, among other factors, (1) whether the victim was suspected of a crime, (2) the severity of the crime, (3) whether the suspect was armed, (4) the suspect's compliance with police commands, and (5) the danger created by the encounter.  *See, e.g.*, *Estate of Larsen ex rel. Sturdivan v. Murr*, No. 06-1094, 2008 WL 40020, at *2–3 (10th Cir. Jan. 2, 2008).

In prison confinement cases, our framework is slightly different.  There, we examine "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1152 (10th Cir. 2006) (quotation omitted) (analyzing injuries occurring during cell lockdown).

Lastly, Plaintiffs point to our school discipline cases.  In these types of cases, "[a]s in the cognate police brutality cases, the substantive due process inquiry . . . must be whether the force applied caused injury so severe, was so disproportionate to the need presented . . . that it amounted to a brutal and

-9-

inhumane abuse of official power literally shocking to the conscience." *Garcia ex rel. Garcia v. Miera*, 817 F.2d 650, 655 (10th Cir. 1987) (quoting *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980)) (discussing excessive corporal punishment in an elementary school).

Regardless of the context of these cases, Plaintiffs argue Berney's unprovoked attack violated their substantive due process rights on two grounds common to all of the cases. First, the application of force was severe, given the injuries alleged in the complaint. Second, the application of force was grossly disproportionate to any reasonable purpose. Berney's administrative task in delivering licensing notice to the business can hardly be described as calling for fast or physical action. The confrontation at The Golden Bone was thus not an emergency.

In the context of Berney's conduct, however, Plaintiffs' analogies are not particularly helpful. Comparing Berney's unprovoked attack to the use of force by police, prison officials, and school disciplinarians ignores two interrelated characteristics common to the excessive force cases and absent from this one:

(1) Police officers, prison officials, and even school authorities are cloaked with the state's imprimatur to use *some level of force* when necessary. *See, e.g.*, *Garcia*, 817 F.2d at 654 (explaining that "ordinary corporal punishment violates no substantive due process rights of school children") (citing *Ingraham v. Wright*, 430 U.S. 651 (1977)).

(2) In excessive force cases the government official's position is precisely what enables the official to harm the victim. The official has a right to exercise physical control. A reasonable person would not feel at liberty to resist an arresting police officer's necessary force. Nor would prisoners feel free to resist a guard maintaining order. And the same applies to school children who, while "not restricted to the same degree as arrestees [and] convicts . . . , are similarly involved in an environment where the state has some lawful control over their liberty." *Hillard v. City and County of Denver*, 930 F.2d 1516, 1520 (10th Cir. 1991). The misuse of power is most obvious, moreover, where the official has the opportunity to deliberate, and still chooses to inflict harm. *Lewis*, 523 U.S. at 853 (discussing cases where the defendant has the time to deliberate but goes on to harm the victim anyway).

Focusing on the two characteristics yields the following analysis: in the typical excessive force cases involving government actors, officials enjoy an express authorization to use some degree of force and, *relying on their official positions*, misuse that authorization. When a public school teacher, for example, exceeds the permitted level of force and inflicts upon a student what amounts to an arbitrary and severe beating, the substantive due process doctrine condemns the act, labeling it a conscience-shocking abuse of official power. Thus, when the two characteristics show up in a case, we can safely say the "abus[e] or misus[e

of] government power . . . demonstrate[s] a degree of outrageousness . . . that is truly conscience shocking." *Livsey*, 275 F.3d at 957–58.

But we have never held that an official government position alone (without, for example, the abuse of that position) warrants liability under the rubric of substantive due process. The presence of the two interrelated characteristics—(1) authorization to use force and (2) the resultant misuse of power in reliance on the official position—in our excessive force jurisprudence explains why we elevate an official's misconduct above ordinary tort law.

### 3.  *Assaults by Government Officials in Other Contexts*

The question remains, then, what exactly are the contours of substantive due process claims premised on physical assault by ordinary government actors? The Supreme Court has suggested, albeit in dictum, that a constitutional right might exist "to be free from assault committed by state officials . . . outside of a custodial setting." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997). But when we step outside the excessive force paradigm, we still must ask, what is it about the attack that transcends the boundaries of an ordinary tort law? Where do we draw the line?

Cases outside the custodial context from several other circuits are helpful in answering these questions. Two cases decided by the Eleventh Circuit, for example, stand for the proposition that an unprovoked attack by a public official

does not, by itself, automatically translate into a substantive due process violation.

In the first case, *Skinner v. City of Miami*, 62 F.3d 344, 346 (11th Cir. 1995), a firefighter sued his colleagues under § 1983 for violating his substantive due process rights by hazing him in an especially degrading and humiliating fashion. The court held this conduct did not constitute a violation of Skinner's substantive due process rights, although it was enough to state a claim under a state law tort. *Id.* at 347–48. The court rejected application of the circuit's excessive force cases, finding them unpersuasive because they involved a *special relationship* between the attacker and the victim. *Id.* at 348 ("The cases [Skinner] relies on arose in the custodial setting and are inapposite.").

In the other Eleventh Circuit case, a college instructor physically attacked an adult student. *Dacosta v. Nwachukwa*, 304 F.3d 1045, 1047 (11th Cir. 2002). Several fellow students restrained the attacker until police arrived and arrested him for criminal battery. Relying on *Skinner*, the court concluded the instructor's conduct, "malicious as it may have been," did not violate the student's substantive due process rights, only her state law right to be free from battery. *Id.* at 1048–49. And again, the court dismissed the excessive force cases as inapplicable. *Id.* ("The cases [plaintiff] cites as authority for her substantive due process claim involve excessive force used by law enforcement officers, and are not applicable to the instant case.").

-13-

The inquiry is thus in what circumstances will a physical assault transcend ordinary state tort law and rise to the level of a constitutional tort. A Seventh Circuit case involving an assault in the employment setting fleshes out the appropriate "shocking the conscience" standard. In *Wudtke v. Davel*, 128 F.3d 1057, 1059 (7th Cir. 1997), a teacher complained that the superintendent for the public school district where she worked abused his authority to extort sexual favors from her:

> He threatened that he would not assign her a classroom aide to alleviate her workload [she taught special education classes], that he would prevent the District from hiring [her husband], and that he would refuse to approve the renewal of her provisional special education license (without which she would lose her job) if she did not engage in sexual acts with him.

*Id.* The court concluded the teacher's allegations stated a § 1983 substantive due process claim precisely because the superintendent's authority over the teacher enabled his ability to assault her. *Id.* at 1063.

These cases help us draw the line in assault cases outside a custodial or law enforcement setting. An assault—standing alone—does not suffice to make out a constitutional substantive due process claim. But an assault under a stated threat, a threat the victim knows an assaulting government official has the authority to carry out, can separate the ordinary common law tort from the substantive due process claim. The combination of serious physical abuse and the assaulting official's use of official authority to force the victim to submit can shock the

-14-

conscience. The superintendent in *Wudtke* succeeded in forcing the teacher to cooperate only because he threatened retaliation, retaliation fully within his power to enforce.

In cases like *Wudtke*, we recognize the same two interrelated characteristics that define our excessive force cases. First, government bestowed certain discretionary powers on the superintendent (classroom resources allocation, hiring decisions, and teaching license renewal). Second, *relying on these powers*, the superintendent sexually assaulted the teacher. We see, in other words, governmental powers employed to facilitate the harm inflicted. And such an abuse of authority can, in an individual case, shock our conscience if sufficiently severe.

### 4. Summary

Combining these principles, the following legal framework emerges: to state a substantive due process claim against government officials not authorized to use force, litigants must show an *abuse* of governmental authority as an integral element of the attack.

Several non-exhaustive factors flowing from these cases help illustrate the requisite abuse of power in claims of excessive force: (1) the harm results from misconduct by a government official; (2) the official has some authority over the victim but is not authorized to use force as a part of the official's position; (3) the official abuses that authority to further the attack; (4) the abuse exceeds run-of-

the-mill negligent conduct, rising to the level of reckless or intentional conduct;[4] and, finally, (5) the injury is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8. We emphasize these factors do not exhaust all possible variations of governmental misconduct. They merely provide a framework—certainly not to the exclusion of other factors—for how we can analyze a case like this one.

## C. Application to this Case

We now take up Plaintiffs' allegations and examine whether Berney's abused his official position as a business license inspector to attack them. While obviously the attack by Berney, a government official, was reckless and caused serious harm, it is also evident that Berney had no authority to use force and did not abuse his official position to further his attack.

### 1. Berney Lacked Authority to Use Force

Berney was not authorized to use force, whether reasonably or not. Denver does not represent to licensees that its inspectors can lawfully use force against non-compliant business owners. To the contrary, Department policies specifically

---

[4] In examining culpable conduct, we also look to a level of premeditation in assessing whether an official abused his office or position of power. *See Lewis*, 523 U.S. at 853–54 ("[W]hen unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates the large concerns of the governors and the governed. . . . Just as a purpose to cause harm is needed for Eighth Amendment liability in a riot case, so it ought to be needed for due process liability in a pursuit case." (internal quotation omitted)).

instruct business license inspectors not to become confrontational when business owners show resistance. *See* Aplt. App. at 289 ("Many times the person being given the [N]otice [to License] will refuse to sign. Under those circumstances, do not become confrontational. Just write that there was a refusal to sign and leave the notice at the business."); *id.* at 225 (noting Berney's deposition testimony that he was "aware that it was unlawful to physically attack a business owner in [his] position as an inspector for the [DEL]"). Berney, in other words, did not have *discretion* to use force.

## 2. *Berney Did Not Abuse His Official Position*

Berney also did not rely on his official position to attack Plaintiffs. While Berney visited the Golden Bone as a part of his duties as a license inspector, he did not leverage his position to further the attack. In fact, Berney's attack appeared to be spontaneous.

According to Plaintiffs, the assault occurred without prior provocation or warning. Although he was at The Golden Bone because of his official duties as an inspector, he visited the premises during normal business hours. Berney was unarmed and had no authority to exercise any level of force against licensees. His only responsibilities were to inspect and enforce dog kennel regulations. Based on the undisputed facts in this record, Berney's assault appeared to be an emotional overreaction made in anger. But nothing about Berney's position with

-17-

the City or his duties as an inspector authorized him to use force—rather, he lost it on the job.

While deplorable, this assault is not obviously distinguishable from an ordinary tort in myriad situations. It was not a situation where Plaintiffs' injuries were caused by an abuse of Berney's authority as a license inspector. And, as we have said, Berney's official position alone is not enough to create a substantive due process claim. As a result, we cannot conclude Berney's conduct violated Plaintiffs' constitutional rights.

To be sure, Berney allegedly yelled out "that he was a City official and could go wherever he wanted to go." Aplt. App. at 21 ¶ 12. But the statement does not suffice to create an objective understanding that Berney had any official imprimatur to use force against Plaintiffs. The relevant city ordinance states, "Inspectors and investigators shall be permitted to have access to licensed premises at all times, in the course of their duties, concerning the enforcement of the Charter, ordinances of the city and rules and regulations promulgated pursuant and thereto." City and County of Denver, Colo., Rev. Mun. Code § 32-17 (2007); *see also* Aplt. App. at 62 (attaching an identical but older version of the ordinance). No objectively reasonable business owner would have thought Berney's unprovoked attack occurred to lawfully further his duties in enforcing the Department's kennel licensing regulations.

\* \* \*

-18-

In sum, Berney was not authorized to use force in performing his daily job and, furthermore, did not rely on the authority of his official position in attacking Plaintiffs. The two interrelated characteristics identified in our excessive force cases are thus absent. Plaintiffs' analogy to police, institutional, or school excessive force cases, then, does not explain what distinguishes Berney's conduct from an ordinary tort, raising it to the level of a substantive due process violation.

In holding Plaintiffs have not alleged a substantive due process violation, we do not mean to suggest Berney's uncivilized—indeed, criminal—actions, if true, are anything less than shameful. But not every condemnable act by a public official represents a constitutional violation. To say that § 1983 welcomes Berney's unprovoked attack would be wrong. Rather, § 1983 simply does not reach Berney's conduct and leaves the matter to state civil remedies.

### III.  Conclusion

Berney's unprovoked assault did not rise to the level of a substantive due process violation. We thus AFFIRM the district court's grant of partial summary judgment to Defendants on Plaintiffs' substantive due process claim.