FILED
United States Court of Appeals
Tenth Circuit

May 14, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KEVIN L. KOESSEL,

        Plaintiff-Appellant,

    v.

SUBLETTE COUNTY SHERIFF'S
DEPARTMENT; BOARD OF
COUNTY COMMISSIONERS
SUBLETTE COUNTY WYOMING;
WAYNE M. BARDIN; WILLIAM W.
CRAMER; JOHN P. LINN; JOEL E.
BOUSMAN, in the individual and
official capacities,

        Defendants-Appellees.

No. 11-8099

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 11-CV-00058-NDF)**

---

Stephen H. Kline (Melinda S. McCorkle with him on the reply brief) Kline Law Office, P.C., Cheyenne, Wyoming, for Appellant.

Richard Rideout, Law Offices of Richard Rideout, PC (with Gregory A. Phillips, Wyoming Attorney General, John D. Rossetti, Deputy Attorney General, and Thomas W. Rumpke, Senior Assistant Attorney General on the brief for Appellee Wayne M. Bardin in his individual capacity), Cheyenne, Wyoming, for Appellees.

---

Before **TYMKOVICH**, **EBEL**, and **O'BRIEN**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

Kevin Koessel was terminated from his position as a deputy sheriff in Sublette County, Wyoming, due to concerns about the lingering effects of a stroke he suffered. In response, Koessel brought a suit in district court against the Sheriff and the County alleging they violated the Americans with Disabilities Act (ADA), breached his employment contract, and violated his substantive and procedural due process rights.

The district court granted the Defendants' motion for summary judgment, finding there were no genuine issues of material fact for a jury.

We agree with the district court that the Defendants' are entitled to summary judgment on all of Koessel's claims. Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM the district court's judgment.

## I. Background

Koessel joined the Sublette County Sheriff's Office as a patrol officer in April 2002. In December 2007, while still a patrol officer, Koessel suffered a stroke. He was placed on administrative leave while he recovered. As part of his treatment, he dropped his smoking habit and began physical therapy. In April 2008, Koessel returned to the Sheriff's Office part time, in a temporary office job in which he conducted vehicle registration checks and approved field reports. After several months of these duties, in August 2008, Koessel's doctor cleared him for full-time work, 40-hours per week, but restricted him from working

overtime. Returning full-time, Koessel continued the desk assignment, although he was authorized to make routine traffic stops while on his daily commute.

During this time, some officers in the Sheriff's Office reported concerns about Koessel's behavior and performance to the Sheriff, Wayne Bardin. For example, in one report, a captain overheard a situation where Koessel became flustered while making a traffic stop because he could not remember a word. The captain suggested to Sheriff Bardin that Koessel not be allowed to initiate traffic stops, but only perform backup duties—a suggestion that Bardin followed. Other officers reported Koessel would lose his temper while on the job. On at least one occasion, Koessel left work early because of blood pressure problems.

These concerns led Sheriff Bardin to place Koessel on administrative leave in April 2009 and order him to undergo an independent medical examination, which was conducted by Dr. Gerald Moress, a neurologist. Sheriff Bardin sent Dr. Moress a letter explaining his concerns about Koessel, in particular Koessel's lapses of memory and blood pressure problems. After conducting an evaluation of Koessel, Dr. Moress made the following finding: "Strictly from a neurological standpoint he would be able to work, but there are potential problems to cognitive functioning that may have resulted from the stroke and should be investigated." App. 125. Dr. Moress recommended Koessel be examined by a neuropsychologist.

Koessel saw a psychologist, Dr. Michael Enright, who performed a psychological fitness for duty evaluation. Though Koessel's scores on a standard psychological test were unchanged from when he first took the test several years earlier (before the stroke), Dr. Enright found that Koessel's symptoms of "mild to moderate fatigue, episodes of lightheadedness and episodes of emotional disinhibition (weeping)" could interfere with the performance of some of his patrol officer duties. *Id.* at 130–31. Dr. Enright recommended Koessel be placed in a low-stress position, one in which he did not have regular contact with the public.

On May 20, 2009, Koessel returned to work from administrative leave—this time as an assistant to the Emergency Management Coordinator, who was housed in the Sheriff's Office. This was not intended to be a permanent position, but a temporary one. On June 17, 2009, Sheriff Bardin informed Koessel that the County Board of Commissioners had not approved additional funds for the position, and again placed Koessel on administrative leave.

On August 12, 2009, Koessel received a letter from Bardin, terminating his employment. It stated in part:

> Sublette County Sheriff's Office is in receipt of the report from Dr.
> Michael Enright, dated April 24, 2009, stating, in part, that you are
> not physically fit to perform the duties of a Sublette County Deputy
> Sheriff. After careful consideration the Sheriff's department has
> determined that there are no available positions in the Sheriff's
> Department for which you are medically cleared to perform. For

> safety purposes and to prevent injury to you or to the public at large, this office has no alternative but to discharge you from duty.

App. 133. The letter also informed Koessel that he had five days to file a written request for a hearing to dispute his termination. Koessel never filed a request, and he was terminated.

Over a year later, Koessel sued the Sheriff's Office, Sheriff Bardin, the Sublette County Board of Commissioners, and the County Commissioners ("Defendants"). He alleged violations of the ADA, breach of contract, and violations of 42 U.S.C. § 1983 involving rights under the Fifth and Fourteenth Amendments (procedural and substantive due process).

After discovery, the Defendants filed a motion for summary judgment. On the ADA claim, the district court noted that a prima facie case required Koessel to show (1) he was disabled within the meaning of the ADA, (2) he was able to perform the essential functions of his job with or without reasonable accommodation, and (3) he suffered discrimination by an employer because of his disability. The district court found that Koessel's claim faltered on the second element, whether he could perform his job with or without reasonable accommodation. The court concluded Koessel could not make a prima facie case of an ADA violation because he put forward no evidence contradicting Dr. Enright's report—which evidence was necessary to establish that Koessel was qualified to perform his job. The court also granted summary judgment on the

breach of contract and due process claims, holding that the Defendants followed appropriate procedures in terminating Koessel and made their decision in good faith.

## II. Analysis

Koessel argues the district court erred in granting the Defendants' motion for summary judgement, claiming fact disputes existed on all of his claims.

We review the district court's order granting summary judgment de novo. *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). "Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *McCarty v. Gilchrist*, 646 F.3d 1281, 1284–85 (10th Cir. 2011). "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

### A. ADA Claim

Koessel first contends the district court erred in dismissing his ADA claim, maintaining the Defendants fired him on the basis of a perceived disability when he was in fact not disabled.

The ADA protects individuals with physical disabilities or mental impairments that substantially limit major life activities, as well as individuals

who are merely perceived to have such impairments. 42 U.S.C. § 12102(1)(C).

To establish a prima facie case of discrimination under the ADA, Koessel must

show (1) he is disabled (or perceived as disabled) as defined by the ADA, (2) he

is qualified to perform the essential functions of his job with or without

reasonable accommodation, and (3) he suffered discrimination as a result of his

disability. *Justice v. Crown Cork & Seal Co.*, 527 F.3d 1080, 1086 (10th Cir.

2008).

A person is perceived as disabled when an employer regards the employee

as suffering from a physical or mental impairment that substantially limits his or

her ability to work. *Id.* An individual may qualify as disabled under the

"regarded as" provision of the ADA in two ways:

> (1) a covered entity mistakenly believes that a person has a physical
> impairment that substantially limits one or more major life activities, or (2)
> a covered entity mistakenly believes that an actual, nonlimiting impairment
> substantially limits one or more major life activities. *Sutton v. United Air
> Lines, Inc.*, 527 U.S. 471, 489, 119 S. Ct. 2139, 144 L. Ed. 2d (1999); *see
> also* 29 C.F.R. § 1630.2(l) (defining "regarded as having such an
> impairment"). In either event, our focus is on an employer's subjective
> state of mind: did the employer mistakenly believe that the plaintiff was
> substantially limited in performing a major life activity? *Sutton*, 527 U.S.
> at 489, 119 S. Ct. 2139.

*Id.* (internal quotation marks omitted).

If Koessel cannot show that there is a genuine issue of triable fact as to any

of the elements of the prima facie case, then the Defendants are entitled to

summary judgment. We agree with the district court that Koessel failed to

demonstrate he could still perform the essential functions of the job with or without reasonable accommodation, and thus cannot meet the second element. We therefore need not address the first or third elements of his ADA claim.

*1. Essential Functions*

The district court based its summary judgment decision on Koessel's purported failure to establish that he is qualified to perform the essential functions of the job with or without reasonable accommodation. According to the district court, Koessel failed to present any evidence contradicting Dr. Enright's assessment that Koessel should not be placed in a position where he could be exposed to extreme stress—a restriction that disqualified him from patrol duty.

Our cases place the burden on the plaintiff to show his qualification for a job, *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1262 (10th Cir. 2009), which is a mixed question of law and fact, *McKenzie v. Dovala*, 242 F.3d 967, 975–76 (10th Cir. 2001). A job function is "essential" if it is fundamental to a position and all employees in the position must perform it. *Hennagir*, 587 F.3d at 1262.

According to the Defendants, Koessel's impairments interfered with at least three essential job functions: (1) preserving the peace at public gatherings, neighborhood disputes and family quarrels; (2) conferring with prosecutors and testifying in court; and (3) apprehending suspects. In support of their argument, they point to the report prepared by Dr. Enright, which recommended Koessel be

placed in a low-stress position that did not require frequent contact with the public. In his report, Dr. Enright referred to the job description for a Sublette County deputy and found that Koessel's symptoms could interfere with the required job functions.

Koessel does not dispute that these are essential job functions, but maintains that he was able to perform them. In support of this argument, he points to several pieces of evidence: (1) his personal physician cleared him to return to work full time in August 2008; (2) he performed 35 traffic stops without incident after returning to work and before he was placed on administrative leave; (3) he drove a patrol vehicle 40 miles each way on his commute without incident between his return to work and his termination; (4) the neurologist, Dr. Moress, found no physical reason Koessel could not perform his job; and (5) the psychologist, Dr. Enright, said Koessel's performance on standard psychological tests was unchanged from his performance before his stroke.

But even accepting this evidence in the light most favorable to Koessel, it only shows he was physically fit for his job, not that he could cope with high-stress situations. Koessel introduced no evidence disputing Dr. Enright's findings that he suffered lingering *psychological* deficits that would interfere with his ability to perform his job. Indeed, concerns about lingering cognitive problems were the reason that Dr. Moress, the neurologist, referred Koessel to a psychologist. Thus, the fact that Dr. Moress did not find anything *physically*

wrong with Koessel does not contradict Dr. Enright's conclusion. A psychologist's report reaching the opposite conclusion to that of Dr. Enright might have created a sufficiently debatable question to send to a jury. But Koessel produced nothing to contradict Dr. Enright's report. And that report advised the County that Koessel be placed in a position that does "not require him to confront members of the public in the usual day-to-day activities of a patrol officer or direct supervisory positions as Sergeant." App. 131.

Koessel unsuccessfully tries to undermine the reliability of Dr. Enright's assessment. Koessel argues Dr. Enright's conclusion was based solely on a letter from Sheriff Bardin containing unsupported allegations. But Koessel admitted during his deposition that he reported his symptoms to Dr. Enright. Koessel also claims his scores on a standard psychological test did not change from the first time he took the test (which was prior to his stroke), proof he contends that he could still perform the essential functions of the job. Yet Koessel does not explain or introduce evidence showing that the problems Dr. Enright focused on—fatigue, lightheadedness, emotional disinhibition—would have been revealed by the psychological test. Thus, there is no support for his argument that the test results conflict with Dr. Enright's conclusion.

That Koessel's examination results were not wholly negative does not mean a jury question remains. Koessel relies on *McKenzie*, 242 F.3d at 975–76, where we reversed a district court's grant of summary judgment in part because the

plaintiff's employer had not ordered her to undergo a psychological examination. There, we found that in the absence of an individualized assessment, there was a question of fact regarding whether she could perform the essential functions of her job. *Id.* at 975. But here, Sheriff Bardin ordered Koessel to undergo not one but two individualized assessments. And the examinations came as a result of observations by fellow officers concerning on-the-job dizziness, memory lapses, and frustration. The medical examinations indicated Koessel could physically perform his duties, but both doctors also concluded he suffered (or could suffer) lingering cognitive and psychological problems. Dr. Enright, in particular, concluded that these problems could interfere with several essential job functions of a patrol officer and recommended Koessel not be placed in high-stress situations or allowed significant public interaction.

Finally, even though Koessel performed several essential duties after his stroke without incident, this does not undermine the district court's decision. Employers may set standards for exceptional situations if the need to perform in an emergency is a realistic component of a job. *Wilkerson v. Shinseki*, 606 F.3d 1256, 1264–65 (10th Cir. 2010). Sheriff's deputies frequently are required to perform their duties in emergencies and other tense, stressful situations. Yet Koessel introduced no evidence that he encountered any such situations after his stroke. Thus, his successful performance of his duties in routine traffic stops

does not undermine Dr. Enright's conclusion that he could have trouble performing in high-stress situations.

In short, Koessel has not provided any evidence casting Dr. Enright's assessment into doubt. Accordingly, the district court did not err by concluding Koessel failed to make a prima facie case that he could perform the essential functions of his job.

### 2. *Reasonable Accommodation*

While we agree with the district court that Koessel did not establish he could perform the essential functions of a patrol officer, we must still consider whether the County made an effort to reasonably accommodate him. *Wilkerson*, 606 F.3d at 1265 ("[B]efore an individual can be deemed not 'otherwise qualified' the employer must make an effort to accommodate the employee's disability."). The ADA requires at least two forms of accommodation, as relevant here: (1) a modification of the particular job performed by the employee, or (2) reassignment to another job that can be performed with or without the first type of accommodation. *Gonzagowski v. Widnall*, 115 F.3d 744, 747 (10th Cir. 1997). Moreover, as a precondition to suit, employees have the burden to request accommodation unless the employer has "foreclosed the interactive process through its policies or explicit actions . . . ." *Davoll v. Webb*, 194 F.3d 1116, 1133 (10th Cir. 1999); *see also EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011) ("[B]efore an employer's duty to provide reasonable

-12-

accommodations—or even to participate in the 'interactive process'—is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice.").

Koessel did not request the first type of accommodation. He argues this is because he could perform his duties without a modification. This does not excuse his failure to request accommodation. It is not the employer's responsibility to anticipate the employee's needs and affirmatively offer accommodation if the employer is otherwise open to such requests. *See id.* And Koessel does not argue the County foreclosed the interactive process by its policies or explicit actions.

Koessel claims he did request reassignment after learning that he would not be returning to his position as a patrol officer. Employers have a duty to reassign, but only when it is reasonable under the circumstances. *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171 (10th Cir. 1999) (en banc). Typically, this means employers are only required to reassign employees to existing vacant positions. *Id.* at 1174–75. A position is vacant when a similarly situated, non-disabled employee would be able to apply for it. *Duvall v. Georgia-Pacific Consumer Prods., L.P.*, 607 F.3d 1255, 1263 (10th Cir. 2010). And while employers need not promote an employee when they reassign him, they are required to consider only lateral transfers or, if none are available, demotions. *Midland Brake*, 180 F.3d at 1176–77. Koessel bears the burden of identifying a specific vacant

position to which he could have reasonably been reassigned. *Duvall*, 607 F.3d at 1263.

Koessel has identified no such position. He claims the County assigned him to an emergency management position and then cut funding for it. But the record reflects that this was only a temporary position, and the County lacked the funds to make it permanent. Koessel provides no evidence that this position was anything more than a temporary one subject to available funding. *Cf. Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 697 (7th Cir. 1998) (employer has no duty under ADA to convert temporary jobs "available to disabled employees who are recuperating from *temporary* restrictions" into permanent jobs for permanently restricted employees). Nor does he identify any other positions to which he could have been reassigned.

In sum, Koessel has failed to create a genuine issue of material fact on the second element of a prima facie ADA case: he has not shown that he could perform the essential elements of the job with or without reasonable accommodation. Accordingly, the district court did not err in granting summary judgment on the ADA claim.

### B. Breach of Contract

Koessel also appeals the district court's grant of summary judgment on the breach of contract claim. Although Koessel had no written employment contract with the Sheriff's Office, Wyoming law provides that a sheriff's deputy "shall not

be discharged from employment, reduced in rank or suspended without pay except for cause and after notice and opportunity for a hearing." Wyo. Stat. Ann. § 18-3-611(b) (2009). The district court found that this statute created an implied contract, but that the County complied with the terms of the contract (which were provided by statute) by having cause for Koessel's termination and providing him with notice and an opportunity for a hearing.

The County disputes the district court's conclusion that Wyoming law created an implied contract; rather, the County contends that it removed Koessel from at-will employment, but nevertheless gave him the right to notice and a hearing. With or without an implied contract, § 18-3-611 governs the process of termination: Koessel could be terminated only for cause and had a right to notice and a hearing prior to termination.

### 1. Cause for Termination

The Wyoming Supreme Court has defined "cause" under § 18-3-611 as "a cause or justification which bears a reasonable relationship to the deputy sheriff's ability and fitness to perform and discharge the duties of his or her position." *Lucero v. Mathews*, 901 P.2d 1115, 1123 (Wyo. 1995). Showing an employee was terminated without cause is essentially the same as showing the employer terminated him in bad faith. *Sheaffer v. State ex rel. Univ. of Wyo.*, 202 P.3d 1030, 1043 (Wyo. 2009). The court looks to whether the employer gave "fair and

honest reasons . . . that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual." *Id.* (citation omitted).

Koessel introduces no evidence the County or the Sheriff acted in bad faith. Indeed, the evidence shows that Sheriff Bardin was concerned about Koessel's performance from at least the time the captain spoke with him; and this concern underlay Bardin's decision to send Koessel to the neurologist and psychologist. Koessel repeats the argument he made on his ADA claim—that the results of his examinations said he was physically fit to return to work and he did his job without complaint for a year after his stroke. He claims the "real" reason he was terminated was the County's fear of liability arising from his operation of a county vehicle.

Even if this is true, it does not show the County or the Sheriff acted in bad faith. Koessel does not explain why fear over his inability to operate a vehicle was an arbitrary or illegitimate reason for terminating him. In context, the County's liability concerns are entirely consistent with the Sheriff's concerns about Koessel's fitness for duty as a patrol officer—the County could incur liability if Koessel's known symptoms resulted in injury to himself or others. Nor does Koessel show the County's rationale was pretextual. The evidence shows that the County, after a series of complaints from fellow officers, investigated whether Koessel was, in fact, impaired. The results of that investigation—reports from the two specialists who examined Koessel—supported the County's stated

reasons for his termination. Koessel has thus failed to demonstrate the County lacked cause to terminate him.

*2. Adequate Notice*

Koessel argues the notice he received was inadequate because it did not specify exactly how he was unfit for duty or from what disability he suffered, depriving him of a meaningful opportunity to challenge his termination. The County argues the Sheriff's letter included a sufficient description of the grounds for termination.

Under § 18-3-611, a sheriff's deputy must a be given notice and an opportunity to be heard. The notice should be "specific" and give the deputy a "real and meaningful opportunity to respond to *every* charge or allegation that is being brought against him and which will be used as a cause for his termination." *Lucero*, 901 P.2d at 1121 (emphasis in original). The Wyoming Supreme Court has equated the type of notice and hearing required under § 18-3-611 to be the same type required by due process. *See id.* at 1120 (noting that the "pretermination hearing opportunity, which necessarily includes notice and a hearing, is not only a by-product of § 18-3-611, but is also a function of constitutional law").

Sheriff Bardin's letter informed Koessel of his pending termination and stated the following: (1) Dr. Enright had concluded Koessel was not physically fit

-17-

to perform the duties of his job;[1] (2) there were no positions in the Sheriff's Office Koessel could perform; and (3) Koessel was being terminated for safety purposes and to prevent injury both to himself and to members of the public.

This notice was adequate. The basis for Koessel's dismissal was the lingering effects of his stroke. The letter informed Koessel that the evidence against him consisted of Dr. Enright's report—which, Koessel stated at his deposition, he had received, reviewed, and discussed with Sheriff Bardin. This report explained Koessel's symptoms and how they could interfere with his duties. Had Koessel desired to dispute the termination decision, the letter provided him with all he needed to know: He had to challenge Dr. Enright's report.

Koessel objects to the notice on the grounds that it did not particularly inform him the County was concerned about his ability to safely operate a vehicle. That is not required. Wyoming law requires Koessel to be informed of every charge or allegation that will be grounds for termination. There is only one allegation here: that he was physically or mentally unfit for the job, and thus he

---

[1] Sheriff Bardin writes in his letter to Koessel that he is in "receipt of the report from Dr. Michael Enright . . . stating, in part, that you are not physically fit to perform the duties of a Sublette County Deputy Sheriff." App. 133. Though Dr. Enright raised concerns about Koessel's mental and emotional well-being, Sheriff Bardin, by referring to Enright's report, appears in his letter to be using the term "physical" holistically to mean that Koessel's symptoms interfere with his overall ability to perform his duties. Thus, Bardin's use of the term "physical" does not conflict with the determinations by Koessel's physician and the neurologist that Koessel was physically able to do his job.

was being terminated for safety purposes. The County need not have informed Koessel of every duty that could be impaired due to his disability, and Koessel cites no authority for such a proposition. Koessel knew enough to mount a challenge to the grounds of his termination if he had chosen to do so.

### 3. *Right to a Hearing*

Sheriff Bardin's letter also informed Koessel of his right to a hearing. It repeated twice that he had to request one within five working days, and stated in bold, underlined type that the request had to be in writing. A copy of the Sheriff Department's rules for disciplinary hearings, which explained the hearing process in further detail, was also attached to the letter. Koessel never requested such a hearing. In the absence of a request, the letter satisfied the County's statutory obligation to provide Koessel with a hearing.

Koessel argues he did not need to request a hearing because the Sheriff's Office breached its implied contract with him, and thus he had no obligation to comply with the terms of the contract. While we need not decide if there was an implied contract here, even if there were, the Sheriff's conduct here would not constitute a breach, let alone a material breach, excusing Koessel's obligation to request a hearing if he wished to challenge his termination. Because, as we have already concluded, the Sheriff's Office had cause to terminate Koessel, it would not have breached any implied agreement by beginning the termination process.

Koessel's breach of contract claim fails because he cannot show he was terminated without cause, received inadequate notice, or was not afforded an opportunity for a hearing.

## C. Procedural Due Process

Koessel next argues the district court erred in granting summary judgment on his procedural due process claim under 42 U.S.C. § 1983.

Koessel argues the process afforded him was constitutionally inadequate,[2] largely for the same reasons he asserts on his breach of contract claim. We assess procedural due process claims in two steps. *Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009). First, we ask whether the plaintiff had a constitutionally protected interest. *Id.* Then, we ask whether the process afforded was adequate to protect that interest. *Id.*

The parties do not dispute that Koessel had a protected property interest in continued public employment under Wyo. Stat. § 18-3-611. They dispute whether the process he received was adequate. The requirements of due process are

---

[2] Koessel contends, in his complaint and in the summary of the argument section of his opening brief, that his § 1983 claims are based on violations of the Due Process Clauses of the Fifth and Fourteenth Amendments. He apparently misconstrues the scope of the Fifth Amendment. The Due Process Clause of the Fifth Amendment applies only to action by the federal government while the Due Process Clause of the Fourteen Amendment applies to actions by state governments. Here, Koessel alleges conduct only done by state authorities, and thus there can be no Fifth Amendment claim. Moreover, because § 1983 imposes liability only for actions taken under state law, even if there were a federal actor involved there would be no Fifth Amendment claim under § 1983. *See Smith v. Kitchen*, 156 F.3d 1025, 1028 (10th Cir. 1997).

essentially the same as those of § 18-3-611: (1) oral or written notice of the charges, (2) an explanation of the evidence, and (3) an opportunity to respond. *Montgomery v. City of Ardmore*, 365 F.3d 926, 936 (10th Cir. 2004).

The only different argument that surfaces in Koessel's due process claim—and not previously addressed in the breach of contract claim—is the nature of the hearing offered to him. Koessel argues that the Sheriff's Office did not give him a pretermination hearing as required by *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985). He contends that he had already been terminated when he received the letter, thereby depriving him of adequate notice and converting the hearing offered in the letter into a constitutionally deficient post-termination hearing.

Yet it is clear the letter did not effect Koessel's termination. Our decision in *Riggins* forecloses Koessel's argument. There, we dismissed a similar argument because the letter the plaintiff received referred to his "proposed termination," stated the termination would be effective later, and informed the plaintiff he had a right to a hearing prior to a final decision. 572 F.3d at 1109–10. Similarly here, Sheriff Bardin's letter referred to Koessel's "impending discharge," indicated that immediate termination would occur only if Koessel failed to request a hearing, and informed Koessel that he could contest the decision. App. 133. The letter's clear implication was that Koessel had not yet

been terminated. Consequently, the letter provided sufficient notice of his right to a hearing.

Koessel's skewed take on the letter is compounded by his misreading of *Loudermill*, which, he insists, requires an informal pretermination hearing, followed by a formal post-termination hearing. Koessel maintains that he was offered the wrong pretermination hearing, a *formal* one. But *Loudermill* does not stand for the proposition that a state cannot offer a formal hearing prior to termination. *Loudermill* establishes a floor for pretermination hearings—notice and an opportunity to respond—rather than a ceiling. *See* 470 U.S. at 546. Here, the pretermination hearing contemplated in Sheriff Bardin's letter, following the established rules of the Sheriff's Office, was well above that floor: it provides a deputy with the opportunity to hear the evidence against him and to respond to it, all within the framework of an adversarial proceeding.

Finally, Koessel further misinterprets *Loudermill* by insisting the hearing offered by the Sheriff's Office cannot have been a pretermination hearing, because then Wyoming law would offer no post-termination hearing. This is not the case. Wyoming law provides for judicial review of agency decisions. *See* Wyo. Stat. Ann. § 16-3-114(a) ("[A]ny person aggrieved or adversely affected in fact by a final decision of an agency in a contested case . . . is entitled to judicial review in the district court for the county in which the administrative action or inaction was taken."). To the extent the state provides more elaborate procedures

*prior* to termination than are required under *Loudermill*, it need not duplicate them after termination. *See Benavidez v. City of Albuquerque*, 101 F.3d 620, 626 (10th Cir. 1996) ("[W]e evaluate the constitutionality of post-termination process in light of the pre-termination procedures it follows."); *Calhoun v. Gaines*, 982 F.2d 1470, 1476 (10th Cir. 1992) (noting a "full-blown adversarial post-termination hearing" is required "unless such was included as part of the pretermination proceeding"); *Powell v. Mikulecky*, 891 F.2d 1454, 1458 (10th Cir. 1989) ("The idea of conducting two identical hearings runs counter to traditional principles of adjudication.").

Here, the fact that an impartial state court could have reviewed Sheriff Bardin's termination decision—itself the product of an adversarial proceeding—to see whether it was supported by "substantial evidence," Wyo. Stat. Ann. § 16-3-144(c)(i)(E), assures us that Wyoming law offers some sort of post-termination process. *Cf. McDaniels v. Flick*, 59 F.3d 446, 461 (3d Cir. 1995) (finding sufficient due process guarantees for college professor when college's termination decision could be appealed to state court). Whether, in light of the pretermination process, this post-termination process is constitutionally sufficient is a question we need not reach, as Koessel waived that issue by failing to request his hearing with the Sheriff's Office. *See Sandoval v. City of Boulder*, 388 F.3d 1312, 1329 (10th Cir. 2004) (citation omitted) (noting that due process claim for termination was waived by failing to request hearing); *see also Lee v. Regents of Univ. of*

*Cal.*, 221 F. App'x. 711, 714 (10th Cir. 2007) (plaintiff "waived any challenge to the fairness of [his employer's] post-termination hearing procedures because he never requested a post-termination hearing").

Accordingly, the district court did not err in dismissing the procedural due process claim.

### D.  Substantive Due Process

Koessel's final claim is that his termination violated substantive due process.

A Fourteenth Amendment substantive due process claim arises when a plaintiff alleges the government deprived him of a fundamental right.  *Williams v. Berney*, 519 F.3d 1216, 1220 (10th Cir. 2008).  Substantive due process protects fundamental liberty interests and protects against the exercise of government authority that "shocks the conscience."  *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008).  While we have not determined whether public employment is a fundamental liberty interest protected by substantive due process, *Potts v. Davis County*, 551 F.3d 1188, 1193 n.1 (10th Cir. 2009), even if it is, Koessel has not asserted a fundamental liberty interest argument.  He argues only that the Defendants' conduct shocks the conscience.

To show the Defendants' conduct is conscience shocking, Koessel must prove a government actor abused his or her authority or "employ[ed] it as an instrument of oppression" in a manner that shocks the conscience.  *Williams*, 519

F.3d at 1220. The Supreme Court has stated there is "no calibrated yard stick" for assessing whether conduct is conscience shocking, but that it depends on the circumstances of each case. *County of Sacramento v. Lewis*, 523 U.S. 833, 847, 850 (1998). Substantive due process prohibits "only the most egregious official conduct." *Seegmiller*, 528 F.3d at 767. Even most intentionally inflicted injuries caused by misuse of government authority will not meet this standard. *Ward v. Anderson*, 494 F.3d 929, 937–38 (10th Cir. 2007); *see also Muskrat v. Deer Creek Pub. Sch.*, No.11-6194, 2013 WL 1730882, at * 20 (10th Cir. April 23, 2013) (teacher conduct did not meet standard of "brutal and inhumane abuse of official power" to make out substantive due process claim).

Whether an action was an abuse of authority depends on several "non-exhaustive factors," such as: (1) the harm results from misconduct by a government official; (2) the official has some authority over the victim; (3) the official abuses that authority; (4) the misconduct exceeds run-of-the-mill negligent conduct, and is intentional or reckless; and (5) the injury suffered is so egregious or outrageous that it shocks the conscience. *Williams*, 519 F.3d at 1224 (discussing excessive force claim).

Koessel claims his allegations meet this standard because (1) he was terminated in violation of the ADA, (2) he was terminated without ever having been the subject of a complaint or any discipline, (3) he did not violate any Sheriff's Department fitness policy, (4) he was not told the real reason for his

-25-

termination, (5) no doctor found him incapable of driving, and (6) he regularly drove his county vehicle without incident.

Even if all of this were true—and some of it is contradicted by the record—it does not demonstrate an abuse of government authority, let alone one sufficient to shock the judicial conscience. Again, Koessel has not demonstrated that the Sheriff's Office's reliance on Dr. Enright's report was pretextual. And its reliance, even if incorrect, provided the department with rational reasons for its decision. Thus, there was no misconduct by County officials, the decision was at worst negligent, and the employment injury suffered—loss of a job—was not so egregious as to shock the judicial conscience.

As a final note, our decision in *Curtis v. Oklahoma City Public Schools Board of Education*, 147 F.3d 1200 (10th Cir. 1998), is instructive. In that case, the school board dismissed an employee after a hearing even though the hearing board received no evidence, did not discuss the specific grounds for the employee's termination, and did not state the reasons for its decision. *Id.* at 1215. We found that, given the plaintiff's failure to present evidence in his defense and his failure to dispute the statements in his employer's termination notice, the superintendent's summary recommendation to the school board provided ample reason for his termination—and thus the employer did not abuse its authority, let alone engage in conscience shocking conduct. *Id.* at 1215–16. Similarly here,

Koessel did not even request a hearing, let alone dispute the allegations in his termination notice or present any evidence in his own defense.

In short, we see no basis for concluding that the County's conduct in terminating Koessel rose to the level of a substantive due process violation.

## III.  Conclusion

For the foregoing reasons, the district court's judgment is AFFIRMED.